Filed 7/18/22

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

<table>
<tr><td>

LISA ROYALS, as Trustee, etc.,

    Plaintiff and Respondent,

        v.

MENG JING LU,

    Defendant and Appellant.

</td><td>

A160985

(Contra Costa County Super. Ct. No. MSP19-01563)

</td></tr>
</table>

    Meng Jing Lu appeals from a pretrial right to attach order (RTAO) issued against her and in favor of Lisa Royals under section 15657.01 of the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act or the Act) (Welf. & Inst. Code, § 15600 et. seq.).

    The underlying dispute in this probate action centers on the testamentary intent and capacity to make certain estate planning decisions of Royals's late father and Lu's late husband, Chambers Daniel Adams, who died at age 99. By petition and cross-petition, Royals and Lu pursue competing claims of financial elder abuse. Each alleges that the other engaged in a scheme to manipulate Adams in his waning years, with the objective of enriching herself at the expense of the other's expected inheritance.

---

    \* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part II.C. of the Discussion.

1

The primary question raised by the appeal, presented as a matter of first impression, is whether the prospect of punitive recovery on a financial elder abuse claim—in the form of exemplary damages or statutory penalties—may be secured by the extraordinary remedy of pretrial attachment. In the published portion of this opinion, we answer that question no.

A financial elder abuse claimant may obtain an attachment for potential compensatory damages and an award of attorney fees and costs associated with those damages, but only if the request for it complies with all applicable provisions of the statutory scheme governing pretrial attachments (the Attachment Law) (Code Civ. Proc., § 481.010 et. seq.). We conclude that Royals's attachment application did not comply with four provisions of the Attachment Law, namely that an attachment request (i) must be supported by competent evidence (*id.*, § 482.040), (ii) must rest on an attachable "amount" (*id.*, § 484.020, subd. (b)), (iii) must be based on a claim "upon which an attachment may be issued" (*id.*, § 484.020, subd. (a)), and (iv) must be measured by the defendant's claimed "indebtedness" to the plaintiff (*id.*, § 483.015, subd. (a)(1)).

No attachment was warranted here, for any of the relief requested, because Royals failed to support her prayer for compensatory damages with competent evidence. (Code Civ. Proc., § 482.040.) And to the extent she sought an attachment for prospective recovery of punitive damages and statutory penalties in addition to compensatory damages, her attachment request also failed to comply with some or all of the attachable amount (*id.*, § 484.020, subd. (b)), attachable claim (*id.*, § 484.020, subd. (a)), and claimed indebtedness (*id.*, § 483.015, subd. (a)(1)), requirements. Accordingly, the RTAO will be reversed.

# I. BACKGROUND

After Adams passed away October 14, 2019, Royals became the successor trustee and sole beneficiary of the Adams Trust (the Adams Trust or the Trust), a living trust established in the early 1990's by Adams and his former wife of 56 years, Cornelia Adams, who passed away in 2008.[1] Lu, Adams's second wife, was 59 years old when she married Adams, then 95 years old, in 2015. According to Lu, Royals never accepted the marriage and saw it as a threat to her inheritance. Royals alleges that Adams intended to leave none of his assets to Lu. Lu denies that allegation and claims Adams intended to provide for her support by depositing certain funds in certain accounts under Lu's control outside of the Trust.

## A. *Petition, Demurrer, and Motion To Strike*

Once Royals became trustee of the Adams Trust following her father's death, she filed a verified petition against Lu for return of trust assets, for breach of spousal fiduciary duty, and for financial elder abuse.[2] According to

---

[1] About the structure of the Adams Trust, Royals alleges that "[t]he Trust names Mr. and Mrs. [Cornelia] Adams as the original co-trustees of the Trust . . . , and, following their deaths, names [Royals] as the successor trustee. . . . [¶] . . . Upon the death of the first spouse, the Trust splits into two subtrusts: a revocable Survivor's Trust and an irrevocable Family Trust. . . . [¶] [Royals] is named as the sole beneficiary of both subtrusts upon the death of the second spouse."

[2] Under section 15610.30 of the Elder Abuse Act, " 'Financial abuse' of an elder . . . occurs when a person or entity does any of the following: [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both. [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or

the petition, Adams had no need for cash late in his life, but nonetheless suddenly encumbered his home in Orinda with a second mortgage, sold a vacation property in Sea Ranch, and deposited the proceeds into accounts controlled by Lu. Royals alleged that, contrary to Adams's testamentary intent, the proceeds from the Orinda second mortgage and from the Sea Ranch sale are actually assets of the Adams Trust. Adams diverted these funds from the Trust, Royals alleged, while acting under the undue influence of Lu and in a state of cognitive decline. In essence, Royals's theory is that her father intended to leave all assets of his estate to her and nothing to his wife, Lu, but that Lu thwarted his plan by misappropriating his assets before his death.

Royal's petition alleged on information and belief that the total amount of the misappropriated funds was "at least $1,095,000." In addition to recovery of that amount, her third cause of action for financial elder abuse sought punitive damages, trebled under Civil Code section 3345, subdivision (b)[3] plus attorney fees and costs. She made no mention of any other basis for relief in her financial elder abuse cause of action, but in her

---

dependent adult by undue influence as defined in Section 15610.70 [of the Act]." (Welf. & Inst. Code, §§ 15610.30, subd. (a), 15610.70.)

[3] Civil Code section 3345 provides in pertinent part that "in actions brought by, on behalf of, or for the benefit of senior citizens or disabled persons . . . to redress unfair or deceptive acts or practices or unfair methods of competition" (*id*., subd. (a)), a remedy up to "three times greater than authorized by the statute" is available if "the trier of fact makes an affirmative finding in regard to one or more of the following factors . . . " (*id*., subd. (b)). These factors include whether the plaintiff acted with knowledge that she was directing her conduct toward a protected person (*id*., subd. (b)(1)), caused the plaintiff to suffer certain losses (*id*., subd. (b)(2)), and how vulnerable the protected person was relative to other members of the public based on their poor physical or mental health (*id*., subd. (b)(3)).

general prayer for relief on all causes of action she included a demand under Probate Code section 859[4] for double the value of her compensatory damages.

### B. *Application for a Writ of Attachment*

On the same day Royals filed her petition, she applied for a pretrial writ of attachment in the amount of $3,440,000. Her attachment application, filed on Judicial Council form AT-105, checked a box indicating that "the facts showing [she] is entitled to a judgment on the claim up on [*sic*] which the attachment is based are set forth with particularity in the [¶] . . . verified complaint." Other than that, there was no evidentiary support for the requested attachment. Nor was there any explanation detailing why she sought an attachment in the amount of $3,440,000, how she calculated that amount, or what the amount was based upon.

Lu made a detailed evidentiary showing in opposition to the RTAO. She submitted seven declarations, including her own. These declarations, collectively, describe Adams's courtship of Lu, which began in 2011, several years before their marriage; Lu's decision to move from Las Vegas to Orinda to cohabitate with Adams; his proposal of marriage and her decision to accept the proposal in 2015; and the observations of people who knew the couple about the genuineness of Adams's affection for Lu and the transformation in his demonstrated level of contentment after he met her late in his life.

---

[4] Probate Code section 859 provides in pertinent part that "[i]f a court finds that a person has in bad faith wrongfully taken, concealed, or disposed of property belonging to a conservatee, a minor, an elder, a dependent adult, a trust, or the estate of a decedent, or has taken, concealed, or disposed of the property by the use of undue influence in bad faith or through the commission of elder or dependent adult financial abuse, as defined in Section 15610.30 of the Welfare and Institutions Code, the person shall be liable for twice the value of the property recovered by an action under this part."

Lu attached to her declaration 32 documentary exhibits, including extensive, detailed correspondence between Royals and Adams discussing his testamentary intent. Also included in this opposition evidence are statements from Adams's doctor, dentist, a real estate broker and others who dealt with him in the year before he died, all of whom attest to his full cognitive acuity until his death, despite his physical decline. Suffice it to say that the portrayal of Adams that we glean from Lu's evidence opposing the issuance of a writ of attachment—showing his mental condition in his final years, his intentions in disposing of his property after his death, and his desire to make financial provision for Lu—contrasts sharply with the portrayal of Adams that Royals offers in her petition.

Some of the evidence Lu presented in opposition to Royals's attachment application suggests that, because Adams made gifts to Lu during his lifetime, the Adams Trust does not encompass all of the assets Royals now claims are assets of the Trust. It also suggests that Adams was, in fact, in need of cash to put aside in accounts outside the Adams Trust for Lu's benefit; that he told Royals she could expect to inherit the Orinda home subject to any encumbrances put on it; and that he felt Royals and her husband were sufficiently well off that they might wish to consider a second home other than the home in Sea Ranch. In its totality, this evidence suggests, contrary to Royals's allegations, that Adams did not intend to leave all of his assets solely to Royals, and that instead he wished to leave enough to Lu so that she could support herself after his death.

As shown by various handwritten notes and emails exchanged between Adams and Royals, and a few from Adams to Lu, there appear to have been unresolved disagreements between father and daughter over two issues: (1) Adams's desire to leave money to Lu for Lu's support following his death,

6

a plan Royals apparently declined to assist him in carrying out; and (2) Royals's request that she be allowed to become co-trustee of the Adams Trust during Adams's lifetime, an entreaty Adams firmly rejected, with reminders to her that he wished to remain in full control of his assets until he died. If these communications are credited, this is a man who insisted upon his financial autonomy to the end, and in his late nineties showed an ability to engage in fairly sophisticated financial planning.[5]

In both tone and substance, it is striking how rational and cogent Adams's writings are, while also displaying a mixture of sanguine acceptance of his coming demise and a level of irritation that seems to stem from disagreements with Royals. Adams felt neglected by Royals, he explained to her, and he was upset with her for arranging to have him sign two testamentary instruments—an amendment to the Trust, and a will—that he later concluded failed to reflect his true testamentary intent. He told Royals these two instruments had been drafted by a lawyer he believed was pursuing her interests, not his, and he seems to have decided to sell the Sea

---

[5] According to Lu, as early as 2016, Adams developed a specific plan to generate income from a corpus of funds after his death sufficient to provide ongoing support for Lu. He told Royals he established a goal of setting aside $600,000 for this, of which seed amounts of $100,000 would come from a CD account maturing in August 2016 (an account held jointly with Royals) and $100,000 would come from Adams's savings over time. The plan required Royals's cooperation because it was founded on money to be taken from an account he and Royals held jointly; it assumed he would live another three years, which gave him time to build an accumulated contribution from his current income; and in the end it assumed he would bequeath the remainder of $400,000 to Lu via will at his death.

Ranch property only after trying, and failing, to enlist Royals's help in funding the accounts he wished to leave for Lu's benefit.[6]

Royals lodged objections to the declarations and documentary exhibits submitted by Lu in opposition to the RTAO, but the trial court made no ruling on the objections. At the time the RTAO issued, this evidentiary showing stood uncontested.

## C. *Cross-petition, Demurrer to Cross-petition, Ruling on That Demurrer, and Grant of the RTAO*

Lu filed a response to Royals's verified petition, denying all material allegations, and a verified cross-petition of her own that repeated and added more detail to the evidentiary showing she made in opposition to the RTAO. Lu's cross-petition alleged, among other things, a claim for financial elder abuse against Royals.

According to the cross-petition, Royals, by fraud and deceit, manipulated Adams into signing the Trust amendment and will with the objective of defeating his true testamentary intent and depriving Lu of the financial provision he intended to make for her outside of the probate process following his death. Lu's basic theory, countering that of Royals, is that Royals is the one who exercised undue influence over Adams and committed financial elder abuse.

---

[6] Among Lu's exhibits is a handwritten note that, if credited, shows Adams writing to Lu on February 17, 2017—months after he signed the disputed testamentary instruments—to confirm his gifts to her and prepare her for how to handle the gifted money. The note begins, "My dear Mengjing," summarizes the sources of his income at the time, and states: "All of the above will end after my death. Your income will then come entirely from savings. As of now . . . our joint savings consist of the following . . . ." Adams then lists funds in Vanguard and Bank of America accounts totaling $557,000, and adds: "I want you to take full charge of the Vanguard and B of A money. It will all be yours soon enough." He closes by encouraging Lu to consult with a financial adviser and make her own will or trust.

8

In response to Lu's cross-petition, Royals filed a demurrer, which the trial court sustained with prejudice on August 11, 2020. A few weeks later, on September 4, 2020, the court granted Royals's request for the RTAO. Without explanation and without any indication that it had considered the evidentiary submissions Lu made in opposition to the RTAO, the trial court granted an attachment in the exact amount requested—$3,440,000. By minute order entered after a brief unreported hearing, the court made a summary "find[ing] in favor of the trustee." The only indication in the record as to the basis for the RTAO was a note in the minute order, "petition approved as prayed."

The RTAO was the second layer of security the court provisionally granted to preserve assets for recovery on Royals's claims. Shortly after Royals applied for an attachment, Bank of America sought and obtained an interpleader order permitting it to deposit with the court $250,558.14 from various Bank of America accounts maintained in Lu's name. We affirmed that order in an unpublished opinion. (*Royals v. Lu* (Dec. 20, 2021, A160265) [2021 WL 5998551, pp. *3–*6].) The RTAO gave Royals an additional $3,440,000 in security on top of the frozen interpleader funds.

Lu timely appealed from the order issuing the RTAO, as well as from orders sustaining Royals's demurrer to Lu's cross-petition, overruling Lu's demurrer, and denying Lu's motion to strike. The RTAO, which arises out of a claim cognizable in probate court under that department's concurrent jurisdiction over Elder Abuse Act claims (Welf. & Inst. Code, § 15657.3, subds. (a)–(c)), but is not itself a probate order, is appealable under Code of

9

Civil Procedure section 904.1, subdivision (a)(5).[7] The prior orders on Royals's demurrer and Lu's demurrer and motion to strike are appealable under Code of Civil Procedure section 906.[8]

## II. DISCUSSION

### A. *Motion To Dismiss*

In our opinion affirming the interpleader order, we had no occasion to assess the merits of the claims Royals alleges in her petition, but we left no doubt that, on the factual record presented—which is, in all material respects, the same record the court had before it when it granted the RTAO—we view this case as one in which the facts are sharply contested, with an outcome in favor of Royals hardly foreordained. (*Royals v. Lu, supra,* A160265 [2021 WL 5998551, pp. *2, fn. 3, * 4, fn. 7].)[9]

Royals apparently took the hint. A week after we filed that opinion, she applied ex parte in the trial court for an order vacating the RTAO, and the trial court granted the requested vacatur the same day. Expressing a desire to relieve us of the need to devote resources to Lu's appeal of the

---

[7] The Probate Code has its own appealability regime. (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2021), ¶ 2:190 [Code of Civil Procedure section 904.1(a)(10) "defers to specific Probate Code provisions on the appealability of orders in decedents' estates administration, guardianship, conservatorship and trust administration proceedings" (italics omitted)].) Those rules do not apply here.

[8] In the unpublished portion of this opinion, (1) we conclude that the trial court erred in sustaining Royals's demurrer to the financial elder abuse cause of action in Lu's cross-claim, but that it correctly sustained the remainder of that demurrer; (2) we conclude that the trial court correctly denied Lu's demurrer to Royals's petition and motion to strike certain items of Royals's prayer for relief; and (3) we reject Lu's claims of judicial bias.

[9] On our own motion, we take judicial notice of the opinion in this prior appeal and the appellate record presented in it. (Evid. Code, § 452, subds. (c)–(d).)

10

RTAO—and pointing out that "[t]he only remaining funds" attached through the RTAO after issuance of the interpleader order consist of a modest amount of money in a Wells Fargo bank account that is too small to warrant the expense of further litigation—Royals then moved in this court to dismiss Lu's appeal of the RTAO. We issued an order deferring a ruling on Royals's motion to dismiss until Lu's pending appeal was fully briefed, argued and taken under submission.

In an apparent effort to buttress her motion to dismiss, Royals filed (1) a motion to augment the record on appeal, (2) a request for judicial notice of the discharge of the writ of attachment, and (3) a motion to take additional evidence on appeal under Code of Civil Procedure section 909 so that we may consider various email communications between counsel for the parties concerning Royals's offer to "release" the writ of attachment and Lu's acceptance of that offer. Royals's primary argument for dismissal is mootness, but on the strength of her Code of Civil Procedure section 909 request she also pursues an election of remedies theory under "the settled rule that the voluntary acceptance of the benefit of a judgment or order is a bar to the prosecution of an appeal therefrom." (*Schubert v. Reich* (1950) 36 Cal.2d 298, 299; see *Lee v. Brown* (1976) 18 Cal.3d 110, 114.)

We grant the request for judicial notice and the motion to augment the record as unopposed, but deny the motion to take additional evidence on appeal. Code of Civil Procedure section 909 motions may be granted only in "exceptional circumstances," and nothing argued here meets that standard. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405, italics omitted.) Turning to the merits of Royals's mootness argument, we deny the motion to dismiss. The trial court's December 27, 2021 vacatur of the RTAO is a nullity. In general, "[t]imely filing of the notice of appeal vests jurisdiction in the appellate court

11

and, subject to certain exceptions . . . , terminates the lower court's jurisdiction." (Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs, *supra*, ¶ 3:2, citing Code Civ. Proc., § 916, italics omitted; see *Hollister Convalescent Hospital, Inc. v. Rico* (1975) 15 Cal.3d 660, 666; *Estate of Hanley* (1943) 23 Cal.2d 120, 123.) As a result, a trial court has no jurisdiction to vacate, modify or otherwise change an order that is the subject of a pending appeal. (*Gallenkamp v. Superior Court* (1990) 221 Cal.App.3d 1, 12 ["Until remittitur issues, the lower court cannot act upon the reviewing court's decision; remittitur ensures in part that only one court has jurisdiction over the case at any one time."].)

Once an appeal is perfected, an automatic stay goes into effect under Code of Civil Procedure section 916 preventing all further trial court proceedings that may undermine the effectiveness of the appeal, including "enforcement of the judgment or order" under review. (Code Civ. Proc., § 916, subd. (a).) The automatic stay specifically suspends the trial court's power to " 'enforce, vacate or modify' " the appealed judgment or order while the appeal is pending. (*Varian Medical Systems, Inc. v. Delfino* (2005) 35 Cal.4th 180, 189.) The purpose of this limit on the trial court's power—which is fundamental to appellate procedure—" 'is to protect the appellate court's jurisdiction by preserving the status quo until the appeal is decided. The [automatic stay] prevents the trial court from rendering an appeal futile by altering the appealed judgment or order by conducting other proceedings that may affect it.' " (*Ibid.*)

Pointing to an automatic stay exception specific to attachment orders where the appellant fails to post an undertaking (Code Civ. Proc., § 917.65 ["The perfecting of an appeal shall not stay enforcement of a right to attach order unless an undertaking is given."]), Royals argues that Lu failed to post

12

a bond, that the trial court retained jurisdiction to enforce the RTAO, and that as a result, the court necessarily retained jurisdiction to vacate the RTAO as well. This logic is flawed. There is a material difference between enforcement and vacatur. On its face, Code of Civil Procedure section 916 draws a distinction between enforcement, on the one hand, and matters that "affect[] . . . the judgment or order appealed from," on the other hand. While in general, enforcement is deemed to be embraced within matters affected by the judgment or order appealed from under Code of Civil Procedure section 916, subdivision (a), the exception carves enforcement matters out of this category where no bond is obtained. If the Code of Civil Procedure section 917.65 reservation of jurisdiction were read to encompass not just enforcement but vacatur, the exception would swallow the general rule under Code of Civil Procedure section 916 and give trial courts unrestricted authority to oust an appellate court of power to review any attachment order for which an undertaking was not obtained—in effect, conditioning the right to appeal on a bond. We reject that interpretation of these two complementary statutes. It overreads Code of Civil Procedure section 917.65 and undermines the fundamental purpose of Code of Civil Procedure section 916.

Once our appellate jurisdiction was properly invoked by Lu's notice of appeal of the RTAO, we had—and still have—a duty to resolve the appeal, absent intervening mootness. And this appeal is not moot. Whatever benefit Lu obtained from the "release" of the RTAO was voluntarily offered by Royals and does not change the fact that, for sixteen months, an attachment order and writ of attachment were in place that deprived Lu of possession of substantial assets—claimed by her to be rightfully hers—without a trial in which Royals was put to her proof. Royals insists that only $30,229 was

13

actually attached, which she claims was plainly justified no matter what we think of whether an attachment order exceeding that amount by more than a hundredfold should have issued. But that is an invitation to resolve this appeal on harmless error grounds, not an argument for dismissal based on mootness. We decline the invitation. For the reasons explained below, no attachment should have issued on this record—in any amount.[10]

## B. *The RTAO*

### 1. Standard of Review

"On appeal from an attachment order, . . . [w]e apply the same evidentiary standard to an attachment hearing decided on affidavits and declarations as to a case tried on oral testimony." (*Goldstein v. Barak Construction* (2008) 164 Cal.App.4th 845, 853, citation omitted.) Although there is no dispute about that basic point, the parties take opposite positions on the standard governing the court's exercise of discretion in granting the RTAO, with Royals urging review of substantial evidence and Lu urging de novo review.

To a degree, both parties are correct. A trial court necessarily makes a factual assessment when deciding to accept or reject the applicant's evidentiary showing in exercising its discretion, and that factual assessment is reviewed for substantial evidence. (*Bank of America v. Salinas Nissan, Inc.* (1989) 207 Cal.App.3d 260, 273.) But where an unsettled question of law requires that we interpret the meaning of a statute, we review the trial court's interpretation de novo. (*People v. Kurtenbach* (2012) 204 Cal.App.4th 1264, 1276.) Because the resolution of this appeal turns on open questions of

---

[10] The flurry of motions filed in connection with Royals's motion to dismiss includes a motion from Lu arguing that Royals's effort to obtain dismissal of this appeal on mootness grounds merits an award of sanctions for the filing of a frivolous motion. We deny the sanctions request.

14

statutory interpretation, Lu has the better of the argument.  Our review here will be de novo.

### 2. Applicable Statutes

This case requires us to address the interplay of the Elder Abuse Act and the Attachment Law.  The Elder Abuse Act, a remedial scheme designed to protect a vulnerable class of citizens, is generally construed broadly in favor of plaintiffs seeking relief on behalf of elders (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 860–861 (*Mahan*)), while the Attachment Law, which authorizes "a harsh remedy [that] . . . causes the defendant to lose control of his property before the plaintiff's claim is adjudicated" (*Martin v. Aboyan* (1983) 148 Cal.App.3d 826, 831), is generally construed strictly according to the letter of its statutory terms.  (*Nakasone v. Randall* (1982) 129 Cal.App.3d 757, 761; *J.C. Peacock, Inc. v. Hasko* (1961) 196 Cal.App.2d 363, 365.)  Below, we briefly summarize pertinent aspects of these two statutory schemes, beginning with the Attachment Law.

### a. *The Attachment Law*

" ' "Attachment is an ancillary or provisional remedy to aid in the collection of a money demand by seizure of property in advance of trial and judgment." ' " (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1476, italics omitted.)  Under the statutory scheme governing attachments in California (Code Civ. Proc., §§ 481.010–493.060), denominated by the Legislature as "The Attachment Law" (Code Civ. Proc., § 482.010), plaintiffs must meet a set of detailed procedural and substantive requirements.  In 1972, our Supreme Court invalidated a predecessor statute that allowed summary pretrial deprivation of a defendant's assets without notice or a meaningful opportunity to be heard.  (*Randone v. Appellate Department* (1971) 5 Cal.3d 536.)  The Legislature " 'clearly had *Randone* in mind' when drafting the current attachment statutes" (*Hobbs v. Weiss* (1999)

73 Cal.App.4th 76, 79), and the "safeguards" embodied in the Attachment Law are designed to rectify due process defects identified in *Randone*. (*Western Steel & Ship Repair, Inc. v. RMI, Inc.* (1986) 176 Cal.App.3d 1108, 1115.)

Procedurally, the plaintiff must meet the burden of showing her claim has " 'probable validity,' " meaning it is "more likely than not that the plaintiff will obtain a judgment against the defendant on that claim." (Code Civ. Proc., § 481.190.) Substantively, the plaintiff must, among other things, present an affidavit or a verified complaint stating "that the attachment is sought to secure the recovery on a claim upon which an attachment may be issued" together with a "statement of the amount to be secured by the attachment." (*Id.*, § 484.020, subds. (a)–(b).) "[T]he amount to be secured by an attachment" is "[t]he amount of the defendant's indebtedness claimed by the plaintiff" (*id.*, § 483.015, subd. (a)) plus allowable costs and attorney fees (*id.*, §§ 483.015, subd. (a), 482.110). The statutory reference to "[t]he amount of the defendant's indebtedness" (*id.*, § 483.015, subd. (a)) is consistent with the traditional usage of pretrial attachment by commercial creditors, a setting where damages in the event of breach may be easily calculated from the parties' agreement (e.g., the amount remaining due on defaulted loan indebtedness). Hence, there is a requirement that "the total amount of the claim or claims [must be] a fixed or readily ascertainable amount . . . ." (*Id.*, § 483.010, subd. (a).)

As a general matter, the statutory remedy of attachment is limited to an "action on a claim or claims for money, each of which is based upon a contract" (Code Civ. Proc., § 483.010, subd. (a)), and if the defendant is a "natural person," only if the contract claim for which attachment is sought "arises out of the conduct by the defendant of a trade, business, or profession"

16

(*id.*, subd. (c)). But there are exceptions. Outside the realm of claims for money based on breach of contract, the remedy of pretrial attachment is available as an aid to civil enforcement of certain statutes,[11] one of which is the Elder Abuse Act.

   b. *The Elder Abuse Act*

As we explained in *Mahan*, "civil actions may be brought under the Act for ' "[p]hysical abuse" ' ([Welf. & Inst. Code,] § 15610.63; see [*id*.,] § 15657), '[n]eglect' ([*id*.,] § 15610.57; see [*id*.,] § 15657), or ' "[f]inancial abuse" ' ([*id*.,] § 15610.30; see [*id*.,] § 15657.5)." (*Mahan, supra,* 14 Cal.App.5th at p. 858.) To strengthen what had previously been a scheme relying on reporting by mandated reporters (former Welf. & Inst. Code, §§ 15620–15621, Stats. 1982, ch. 1184, § 3, pp. 4225–4226) and public enforcement by prosecutorial authorities, in 1991 the Legislature created a remedial scheme specifically for these private actions. (Welf. & Inst. Code, §§ 15657 [physical abuse, neglect, abandonment], 15657.5 [financial elder abuse]; *Mahan*, at p. 858.)

"The template for private enforcement in cases involving physical abuse or neglect was set by the addition of section 15657 to the Act in 1991. [Welfare and Institutions Code] [s]ection 15657 has been amended several times since then, but the core of it remains the same today. It sets forth a scheme of heightened remedies—punitive damages ([Welf. & Inst. Code,] § 15657, subd. (c)), attorney's fees and costs (*id.*, subd. (a)), and exemption

---

[11] See Welfare and Institutions Code section 15657.5 (actions for damages in financial elder abuse cases); Civil Code section 8468 (claims by mechanics seeking a lien upon property they have improved); Civil Code section 3065a, (claims by loggers); Harbors and Navigation Code section 495.1 (actions against vessels); Labor Code sections 3707, 5600 (workers' compensation claims); Revenue and Taxation Code sections 7864, 8972, 11473, 12680, 19373, 30202, 32352 (actions for collection of delinquent taxes); California Uniform Commercial Code section 6106.2, subdivision (c) (creditors' claims against the proceeds of bulk sales).

from certain limitations on recoverable damages in survivorship actions (*id.*, subd. (b))—designed to provide incentives for 'interested persons to engage attorneys to take up the cause of abused elderly persons. . .' ([Welf. & Inst. Code,] § 15600, subd. (j)). These remedies are available only where the plaintiff proves by clear and convincing evidence that 'the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse.' ([Welf. & Inst. Code,] § 15657.)" (*Mahan, supra*, 14 Cal.App.5th at p. 858, fns. omitted.)

In 2004, the Legislature "created a new class of claims for 'financial abuse,' enacting a private enforcement provision—[Welfare and Institutions Code] section 15657.5—tailored to these claims in particular. [Welfare and Institutions Code] [s]ection 15657.5 sets forth a scheme of heightened remedies closely paralleling those available under [Welfare and Institutions Code] section 15657, but with some key differences, principally that attorney's fee and cost awards are available for 'financial abuse' claims proved by the preponderance of the evidence, while clear and convincing evidence remains the standard applicable to fee and cost recovery for claims of 'physical abuse' or 'neglect.' " (*Mahan, supra*, 14 Cal.App.5th at p. 859, fns. omitted.) For recovery of punitive damages, the culpability standard remains proof by clear and convincing evidence of recklessness, oppression, fraud, or malice. (See Welf. & Inst. Code, § 15657.5, subds. (c), (d).)

"In 2007, the Legislature, acting on reports that the intent to encourage private claims by 'providing for enhanced remedies . . . "has largely been unrealized . . . ," ' made available the remedy of prejudgment attachment as a way to facilitate quick recovery of losses in 'financial abuse' cases. ([Welf. & Inst. Code,] § 15657.01; Stats. 2007, ch. 45, § 1, p. 191.)" (*Mahan, supra*, 14 Cal.App.5th at p. 859.) The purpose of making pretrial attachment

available to financial elder abuse actions claimants was to help claimants "preserve the elder or dependent adult's assets wrongfully held by defendant until judgment is rendered." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 611 (2007–2008 Reg. Sess.) as amended Mar. 26, 2007, p. 4; see Assem. Com. on Judiciary, Analysis of Senate Bill No. 611 (2007–2008 Reg. Sess.) as amended May 31, 2007, p. 4 ["The attachment procedure is a useful tool to prohibit the perpetrator from disposing of the elder or dependent adult's assets in his or her possession prior to final disposition of the case."].)

Welfare and Institutions Code section 15657.01, the statute specifically authorizing pretrial attachment in financial elder abuse actions, reads in pertinent part as follows: "Notwithstanding section 483.010 of the Code of Civil Procedure, an attachment may be issued in any action for damages pursuant to [Welfare and Institutions Code] Section 15657.5 for financial abuse of an elder . . . as defined in Section 15610.30. The other provisions of the Code of Civil Procedure not inconsistent with this article [the Elder Abuse Act] shall govern the issuance of an attachment pursuant to this section." Section 483.010 of the Code of Civil Procedure, as noted above, is the limiting statute restricting the scope of the Attachment Law to contract claims for damages, absent a statutory exception. Welfare and Institutions Code section 15657.01 is such an exception. The first sentence of this statute extends the remedy of attachment to financial elder abuse "action[s] for damages" under the Act by disabling Code of Civil Procedure section 483.010 (Welf. & Inst. Code, § 15657.01), while the second sentence ensures that all "other" procedural and substantive standards of the Attachment Law that are consistent with the Elder Abuse Act must be met (Welf. & Inst. Code, § 15657.01).

19

### 3. Analysis

#### a. *Uncertainty in the Basis for Attachment Amount*

It is unclear what justified an attachment amount of more than three times the actual damages that Royals pleaded on information and belief.  In her third cause of action for financial elder abuse, she pleads as follows:  "The Court should award damages according to proof, but on information and belief at least $1,095,000, against Respondent for her financial elder abuse.  [¶] . . . Respondent acted with oppression, fraud, or malice in committing financial elder abuse against Mr. Adams.  The Court should award exemplary damages against Respondent according to proof, trebled pursuant to Civil Code section 3345."  Since Royals's pleaded claim for actual damages of "at least" $1,095,0000 plus an estimate of attorney fees and costs of $155,000 was the sole basis of her attachment request—as incorporated by check-the-box cross-reference—some unexplained multiple of the damages set forth in the petition appears to account for the great bulk of the attachment amount, but what justified that multiple is obscure.

The position Royals takes here on appeal in defense of the RTAO adds no greater clarity.  She argues in her responding brief that the $3,440,000 attachment amount "included punitive damages[] and estimated attorney's fees and costs," but she provides no itemization.  And she appears to back away from any suggestion that the $3,440,000 includes statutory penalties.  Lu "provides no evidence," Royals argues in her responding brief, "that the attachment order included damages pursuant to Civil Code section 3345."  Royals also argues that "the record"—a record she made—"does not indicate if the additional damages included in the attachment amount were ordered under Probate Code section 859 . . . ."

In response to our request for supplemental briefing asking the parties to address the basis of the attachment amount, Royals takes a different tack.

20

Departing from the allegations of her elder abuse claim as pleaded, she argues that the $3,440,000 figure is predicated on "simple arithmetic" showing $1,095,000 in compensatory damages, plus $2,190,000 in statutory penalties under Probate Code section 859 (double the amount of compensatory damages), plus $150,000 in attorney fees and $5,000 in costs. This calculation appears nowhere in the record of proceedings before the trial court. Apparently, in preparing a defense to the attachment request, it was up to Lu to discern the basis for $2,345,000 of the requested attachment amount by picking from the menu of remedies in Royals's general prayer for relief, while accepting the predicate $1,095,000 as established on Royals's information and belief.

Royals's elusiveness about the basis for requesting an attachment of $3,440,000 is troubling. Having pleaded compensatory damages on information and belief, she claimed a need for security in an amount that added a hefty seven-figure sum to her claimed actual damages and has never been clear about the basis for the additional increment. The trial court might have insisted upon an evidentiary and legal foundation providing more specifics, but in the end did not question the requested attachment amount and simply rubber-stamped it, apparently, as we were told at oral argument, based on representations of Royals's counsel at the hearing on the RTAO. For our part, we need not engage in guesswork or accept representations of counsel at this stage. To cover all the potential bases for the requested attachment amount, we will consider all forms of potential recovery Royals has relied upon—as pleaded, or in her appellate briefs—and address whether any of them, individually or together, can legally support the issuance of an attachment order in the amount of $3,440,000.

We conclude that some elements of Royals's claimed recovery can support an attachment on a financial elder abuse claim (compensatory damages, attorney fees and costs) and some cannot (punitive damages, statutory penalties under Civil Code section 3345 or Probate Code section 859), but that on this record her $3,440,000 attachment request supports no attachable amount and should have been rejected outright. The request was legally deficient for failure to comply with four provisions of the Attachment Law—Code of Civil Procedure sections 482.040, 483.015, subdivision (a)(1), and 484.020, subdivisions (a) and (b)—each of which we address below. Royals makes no claim that any of these provisions is inconsistent with the Attachment Law.

b. *Noncompliance with the Attachment Law*

First, and most basically, an attachment application must be supported by an affidavit or an equivalent verified complaint "show[ing] affirmatively," based on facts "set forth with particularity," that "the affiant, if sworn as a witness, can testify competently to the facts stated . . . ." (Code Civ. Proc., § 482.040.) In her third cause of action for financial elder abuse, Royals pleads as follows: "The Court should award damages according to proof, but on information and belief at least $1,095,000, against [Lu] for her financial elder abuse." This allegation fails to comply with Code of Civil Procedure section 482.040. To the extent Royals's attachment application attempted to rely upon it, the application was not based on facts within her personal knowledge.

Second, an application for an attachment must include a statement of the "amount to be secured by the attachment." (Code Civ. Proc., § 484.020, subd. (b).) Royals pleads damages in an open-ended way and fails to explain the seven-figure damages multiple she impliedly requests on top of her vaguely pleaded compensatory damages and estimated attorney fees and

22

costs, either in her petition or in her attachment application. Wholly apart from her failure to support her request with competent evidence, the uncertainty in the requested attachment "amount" warranted denial of an attachment order.

Within the scheme of the Attachment Law, section 484.020, subdivision (b) of the Code of Civil Procedure complements and serves the same function as the requirement in contract actions that where an attachment is sought "the total amount of the claim or claims [must be] a fixed or readily ascertainable amount." (Code Civ. Proc., § 483.010, subd. (a).)[12] The " 'fixed or readily ascertainable amount' requirement embodies a notice principle, that the defendant in the pending case and any other creditors are given notice of the maximum amount of the property so affected." (16A Cal.Jur.3d (rev. May 2020) Creditors' Rights and Remedies, § 77.) It also ensures that the attachment request may be fairly and accurately determined in summary proceedings before trial. (*Connecticut v. Doehr* (1991) 501 U.S. 1, 20 ["At best, a court's initial assessment of each party's case cannot produce more than an educated prediction as to who will win. This is especially true when," as in a tort case where the plaintiff seeks damages for assault, "the nature of the claim makes any accurate prediction elusive."].)

---

[12] *Kemp Bros. Construction, Inc. v. Titan Electric Corp.*, *supra*, 146 Cal.App.4th at page 1481, footnote 5 (an "attachment order may be issued only if the claim sued upon is, inter alia, for money based upon a contract and is of a 'fixed or readily ascertainable amount.' (§ 483.010, subd. (a).) Although damages need not be liquidated, they must be measurable by reference to the contract sued upon, and their basis must be reasonable and certain."); see *CIT Group/Equipment Financing, Inc. v. Super DVD, Inc.* (2004) 115 Cal.App.4th 537, 540.

Mindful that the Attachment Law was enacted in an effort to rectify due process problems in a predecessor statute (*Western Steel & Ship Repair, Inc. v. RMI, Inc.*, *supra*, 176 Cal.App.3d at p. 1115; see *Randone v. Appellate Department*, *supra*, 5 Cal.3d at pp. 543–563), we read Code of Civil Procedure sections 484.020, subdivision (b), and 483.010, subdivision (a), to require an equivalent degree of certainty in the requested attachment "amount," and for the same reason:  To ensure that the defendant has meaningful notice of what she is contending with, and to ensure that the attachment amount may be accurately determined in summary proceedings prior to trial.  Reading the Attachment Law as a whole, therefore, we believe that what the Legislature intended when it required attachment applicants to specify the "amount" to be attached (Code Civ. Proc., § 484.020, subd. (b)) is that they state "a fixed or readily ascertainable amount" (§ 483.010, subd. (a)), whether in contract actions or in any other action where attachment is authorized by statute. Because Royals pleads no definite amount of compensatory damages, nor any basis for determining what exactly these damages are, her attachment request does not meet this standard.

Third, an attachment applicant must present a "statement showing that the attachment is sought to secure . . . recovery on a claim upon which an attachment may be issued" (Code Civ. Proc., § 484.020, subd. (a)), and in a financial elder abuse action, attachment is only authorized "in any action for damages."  (Welf. & Inst. Code, § 15657.01.)  Statutory penalties are not damages.  They are awarded as an enhancement to damages recovery, at a multiple of two under Probate Code section 859 (sometimes loosely called "double damages") and a multiple of three under Civil Code 3345, subdivision (b) (sometimes loosely called "treble damages"), but to be precise they are not the same as damages.  (*Hill v. Superior Court* (2016)

24

244 Cal.App.4th 1281, 1286 [Probate Code section 859 penalties are not equivalent to punitive damages]; *Estate of Ashlock* (2020) 45 Cal.App.5th 1066, 1074 [same].) To the extent Royals's attachment request was founded on statutory double or treble damages recovery under these two statutes, it did not fall within the authorizing provision in section 15657.01 of the Elder Abuse Act permitting issuance of an attachment in a financial elder abuse "action for damages." Thus, it failed to meet the requirement that an attachment applicant must submit a statement showing that requested attachment would "secure the recovery on a claim upon which an attachment may be issued." (Code Civ. Proc., § 484.020, subd. (a).)

Fourth, and finally, "the amount to be secured by an attachment" must be based on "[t]he amount of the defendant's indebtedness claimed by the plaintiff." (Code Civ. Proc., § 483.015, subd. (a)(1).) " 'The term "indebtedness" has no rigid or fixed meaning, but rather must be construed in every case in accord with its context.' " (*Carman v. Alvord* (1982) 31 Cal.3d 318, 326.) "It can include all financial obligations arising from contract," " 'obligations which are yet to become due as [well as] those which are already matured' " (*id.* at pp. 326–327), and "may be created by statute rather than contract" (*Patton v. City of Alameda* (1985) 40 Cal.3d 41, 46). We construe it in the context of the Elder Abuse Act to mean claimed liability for *compensatory* damages, consistent with the evident purpose expressed by the Legislature in authorizing attachment as a means to facilitate make-whole relief via return of money or property.

To the extent Royals's attachment request was based on her demand for punitive damages, it did not comply with Code of Civil Procedure section 483.015, subdivision (a)(1) of the Attachment Law because a demand for punitive damages is not a claim for "indebtedness." Had Royals supported

25

her attachment request with competent proof and a sufficiently specific statement of the amount she sought to secure, her prayer for compensatory damages could be considered a claim for "indebtedness" subject to attachment, as could her prayer for attorney fees and costs, an additional mandatory item of recovery in a financial elder abuse action (Welf. & Inst. Code, § 15657.5., subd. (a)) that is expressly attachable under the Attachment Law (Code Civ. Proc., §§ 483.015, subd. (a)(2), 482.110). But a claim for punitive damages recovery is meant to deter and punish, not to make anyone whole.

In her supplemental brief, Royals argues that section 15657.01 of the Welfare and Institutions Code authorizes attachments for all claimed liability in any financial elder abuse "action for damages" and that punitive damages are simply a form of damages. We reject that interpretation. Structurally, the procedural schemes of the Attachment Law and the Elder Abuse Act are incompatible with it. On the one hand, under section 481.190 of the Code of Civil Procedure, an attachment may issue where the court makes a finding by a preponderance of the evidence that a claim of financial elder abuse has " 'probable validity.' " On the other hand, under section 15657.5, subdivisions (b) and (d) of the Welfare and Institutions Code, punitive damages recovery is available in an elder abuse action only upon proof by clear and convincing evidence of recklessness, oppression, fraud, or malice. Even if, in the abstract, it were possible to imagine that a trial court could attempt to assess by a preponderance of the evidence the plaintiff's chances of prevailing on the issue of punitive damages by the higher standard of clear and convincing evidence—a concept that requires considerable mental gymnastics to conjure up—we see no basis in the text of either statutory scheme to justify adopting

26

such a novel, two-level standard of proof.  We doubt that it would be practically administrable in any event.

Constitutional considerations come into play here are well.  The difficulty of assessing the benchmark of clear and convincing proof by a preponderance of the evidence not only poses difficulties of administration, but also presents due process problems.  Because civil defendants are not accorded the protections afforded criminal defendants, punitive damages always " 'pose an acute danger of arbitrary deprivation of property.' " (*State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408, 417, quoting *Honda Motor Co. v. Oberg* (1994) 512 U.S. 415, 432.)  On the less than fully developed record presented in summary attachment proceedings, it would pose too great a risk of arbitrary deprivation if trial courts were charged with projecting the likelihood of punitive damages recovery.  There are too many nuances to the multi-pronged test governing punitive damages (*Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159, 1171–1172) to expect that a provisional evaluation of that issue can be done in an accurate and reliable way in an attachment proceeding.  While it is true that the Elder Abuse Act must be broadly construed in favor of elders, the paramount importance of ensuring that the Attachment Law conforms to due process standards must carry the day.

What we see here, in the overall, is that the Legislature enacted a broad remedial scheme to protect elders, but in adding pretrial attachment to the package of available remedies to the scheme, made use of a statutory remedy that, within its own scheme, has long been interpreted narrowly. Our reading of these two schemes together—permitting the attachment of well-supported claims for compensatory relief along with associated requests

for attorney fees and costs, while rejecting the attachability of claims for punitive damages and statutory penalties—strikes an appropriate balance.

## C. *The Trial Court Erred in Sustaining Royals's Demurrer to Lu's Cross-petition*

In December 2019, Lu filed a demurrer to Royals's petition arguing that, as pleaded, the first claim in the petition seeking return of trust assets fails to state a cause of action under Probate Code section 850, and that the prayer for punitive damages does not plead facts sufficient to constitute oppression, fraud or malice as required by Civil Code section 3294. Along with her demurrer, Lu also filed a motion to strike, repeating her attack on the request for punitive damages on the same grounds, and adding an additional argument that Royals's request for statutory penalties under Civil Code section 3345 should be stricken because that statute applies only in the context of commercial transactions. The trial court overruled Lu's demurrer and denied her motion to strike.

In February 2020, following the rulings on her demurrer and motion to strike, Lu filed a response to Royals's verified petition, denying all material allegations, and a verified cross-petition of her own that tracked the evidentiary showing she made in opposition to the RTAO. According to the cross-petition, Royals, by fraud and deceit, manipulated Adams into signing a will and an amendment to the Trust that were contrary to his true testamentary intent, and that deprived Lu of the financial provision he intended to make for her outside of the Trust. The sixth count in Lu's cross-petition alleged a claim for financial elder abuse against Royals. In response to Lu's cross-petition, Royals filed a demurrer, which the trial court sustained with prejudice as to all causes of action.

Lu timely appealed the RTAO, the order overruling her demurrer and motion to strike, as well as the order sustaining Royals's demurrer.

28

### 1. Standards of Review

"We review a trial court's ruling on demurrer de novo . . . , giving ' "the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. . . . We deem to be true all material facts properly pled. . . . We must also accept as true those facts that may be implied or inferred from those expressly alleged." ' " (*Mahan*, *supra*, 14 Cal.App.5th at p. 847, citations omitted.)

Typically, the denial of a motion to strike is reviewed for abuse of discretion. (*Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 612.) When the motion seeks to strike allegations of punitive damages, however, the standard of review is de novo, because the "motion to strike, like a demurrer, challenges the legal sufficiency of the complaint's allegations, which are assumed to be true." (*Blakemore v. Superior Court* (2005) 129 Cal.App.4th 36, 53.) " 'In passing on the correctness of a ruling on a motion to strike, judges read allegations of a pleading subject to a motion to strike as a whole, all parts in their context, and assume their truth.' [Citation.]" (*Kaiser Foundation Health Plan, Inc. v. Superior Court* (2012) 203 Cal.App.4th 696, 704.)

### 2. The Order Sustaining Royals's Demurrer Was Erroneous

Because the arguments advanced by Lu in her appeal of the trial court's order sustaining with prejudice Royals's demurrer to the cross-petition are limited to Lu's fourth count seeking correction of Adams's death certificate and sixth count for financial elder abuse, our review on the merits will be limited to those claims.

The trial court sustained Royals's demurrer on three grounds—lack of standing, failure to state a claim upon which relief may be granted, and failure to serve summons and notice of the date of hearing on the petition. Its ruling sustaining the demurrer with respect to the fourth count was

sound.  Royals correctly argued that, before Lu filed her cross-petition, she did not make a correction request to the county registrar (Health & Saf. Code, § 103225) and thus she failed to exhaust available administrative remedies.  Beyond that, however, each of the cited grounds for sustaining Royals's demurrer was erroneous.  To begin with, because Royals made a general appearance in filing and pursuing her own petition, as well as by filing a demurrer, she waived an objection to improper service of summons. (Code. Civ. Proc. § 410.50, subd. (a).)  And the issue of notice of the hearing date for adjudication of the cross-petition on the merits (a date which Lu had not yet requested and the court had not yet calendared) was not a proper subject of demurrer.  To the extent Royals had a genuine concern about notice of merits adjudication, asserting it by demurrer was premature.

Nor is there any merit to Royals's argument that the sixth count in the cross-petition is legally deficient.  Lu's cross-petition for financial elder abuse is essentially the mirror-image of Royals's petition alleging the same type of claim:  Lu alleges "deprivation" of "property" of an elder (i.e., assets Adams sought to make to his wife via a "donative transfer" outside the Trust) by "undue influence."  (Welf. & Inst. Code, § 15610.30, subd. (c).)  The principal thrust of Royals's claim that Lu's sixth count fails to state a claim is a standing argument.  Royals argues that, as trustee of the Adams Trust, she is exclusively empowered to pursue financial elder abuse claims on behalf of Adams, and Lu, as a "stranger to the Trust," lacks standing to do so. According to Royals, Lu cannot show damages because, even if there were "a finding that Royals committed elder abuse against Adams[,] any such damages would flow to the Trust from which Lu will not take."

We are unpersuaded.  Lu correctly points out that, when the trustee of an elder's trust or the executor of an elder's estate is herself accused of

30

financial elder abuse, the Elder Abuse Act expressly grants to a third party with an interest in the claim standing to pursue it instead of the conflicted fiduciary. (Welf. & Inst. Code, § 15657.3, subd. (d)(2).) Given the alleged obstruction of Adams's intended gifts to Lu outside of probate, Lu has standing to pursue such a claim here on that basis. Royals resists this conclusion, but her argument presupposes that anything recovered in a financial elder abuse claim on Adams's behalf must ultimately be recovered by his estate and the distribution thereof must run through probate. This line of argument assumes its conclusion. It rests on the disputed assumption that Adams intended everything he owned in the years preceding his death to be an asset of the Trust as of the date of his death, and that the disposition of those assets would be controlled exclusively by his will and the terms of the Trust.

By attacking the validity of the will and amended Trust, Royals argues, Lu is in effect trying to claim she is entitled to inherit through intestate succession, which according to Royals is a futile endeavor because even if those instruments are invalid, Royals was the sole beneficiary of the Trust prior to September 2016. The premise of this argument is incorrect. To prevail, Lu does not need to inherit by intestacy. Royals alleges that the disputed funds here were placed in some combination of accounts maintained solely in Lu's name and a joint account maintained in the names of Adams and Lu as husband and wife. To the extent Adams deposited funds directly into accounts solely controlled by Lu while he was still alive, at his death any such pre-death gifts were not assets of the Trust or part of his estate. And as for any funds that were deposited in or that passed through a joint account, a testator may deposit funds in a joint account with a right to survivorship, and at his or her death the funds in the account will pass directly to the survivor

31

outside of probate. (Prob. Code, § 5302, subd. (a); see *Estate of O'Connor* (2017) 16 Cal.App.5th 159, 171; *Estate of Petersen* (1994) 28 Cal.App.4th 1742, 1751.)[13]

Any "interested person, as defined in Section 48 of the Probate Code" (Welf. & Inst. Code, § 15657.3, subd. (d)), has standing to bring a financial elder abuse action. The phrase "interested person," as used in section 15657.3 of the Elder Abuse Act, includes "[a]n heir, devisee, child, spouse, creditor, beneficiary, and any other person having a property right in or claim against a trust estate or the estate of a decedent which may be affected by the proceeding." (Prob. Code, § 48, subd. (a)(1).) On the facts alleged, Royals as an individual committed financial elder abuse against Adams, and after Adams's death, Royals as Trustee is attempting to reap the benefit of that wrong by contending that assets intended to be gifted to Lu are assets of the Trust. As Lu puts it, "both parties . . . claim interest in the same property." Thus, she contends, she is a spouse with a claim against Royals—both as Trustee and as an individual—and the disposition of that claim will be "affected by" these probate proceedings.[14] We agree. The theory here, just as

---

[13] The Adams Trust, to be sure, consists of two subtrusts, the revocable Survivor's Trust and the irrevocable Family Trust. (See fn. 1, *ante*.) Even if, at Adams's death, some portion of purportedly gifted funds in accounts solely or jointly maintained by Lu are traceable to Cornelia Adams's separate property share of the Trust assets in the irrevocable Family Trust, that does not mean *all* of the disputed proceeds from the Orinda Mortgage and the Sea Ranch sale were Trust assets when he died, and thus subject to clawback in their entirety, as Royals invites us to presuppose. During his lifetime, Adams was empowered to gift his own separate property assets in the Survivor's Trust to anyone he pleased, as he saw fit, so long as he had the capacity to make decisions to do so.

[14] Citing *Goldstein v. Barak Construction, supra*, 164 Cal.App.4th at page 852, Lu also contends that "the attachment amount must be reduced by

it was in *Mahan* based on the alleged financial elder abuse scheme in that case, is that Royals obstructed Adams's estate plan and "deprived" Lu "of property indirectly, using the Trust as an instrument of [her] scheme." (*Mahan*, *supra*, 14 Cal.App.4th at p. 862.) To funnel recovery on such a claim back into the hands of the person who allegedly carried out the scheme would defeat the purpose of Welfare and Institutions Code section 15657.3, subdivision (d)(2). The demurrer to Lu's sixth count for elder abuse was erroneously sustained.

No other aspect of the order sustaining Royals's demurrer to Lu's cross-petition having been challenged here on appeal, the order will be reversed in part with respect to the sixth count, and otherwise affirmed (on the merits with respect to the fourth count, and by default with respect to all other counts).

### 3. The Trial Court Properly Denied Lu's Demurrer to Royals's Petition

Following the filing of Royals's petition on October 24, 2019, Lu's time to demur was 30 days following proof of personal service on October 25, making the deadline November 25, 2019. (Code Civ. Proc., § 430,40, subd. (a); Prob. Code, §§ 1000, 1044.) Lu filed her demurrer on December 17, 2019. The trial court overruled it as untimely. (See Code Civ. Proc., § 430.40, subd. (a); Prob. Code, §§ 1000, 1044; Cal. Rules of Court, rule 3.110, subd. (d).)

Here on appeal, Lu fails to address the issue of untimeliness. She complains instead that Royals's demurrer to Lu's cross-petition was untimely as well, but that the court excused Royals's tardiness as a matter of

---

the amount of any indebtedness of the plaintiff that the defendant has claimed in a cross-complaint." We need not address this contention in light of our holding that the RTAO must be reversed in its entirety.

discretion. Lu argues it is "unfathomable" that the court could have reasonably refused to excuse her tardiness while treating Royals with lenity. "What is sauce for the goose is sauce for the gander" is not a legal argument, and we reject the invitation to employ the concept here. The trial court's orders are presumed correct. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) Lu has not borne her burden to demonstrate error. Applying the presumption of correctness, we conclude the trial court was correct to overrule her demurrer.

### 4. The Trial Court Properly Denied Lu's Motion To Strike

Lu moved to strike aspects of Royals's petition on several grounds. First, she argued that Civil Code section 3345 does not apply to financial elder abuse cases, but only to commercial cases. The trial court rejected the argument, ruling that Civil Code section 3345, by its literal terms, expressly contemplates that the statute applies to "actions brought by, on behalf of, or for the benefit of senior citizens . . . to redress unfair or deceptive acts . . . ." (*Ibid.*) The ruling was correct. Second, she argued that Royals's petition failed to plead facts sufficient to give rise to punitive damages under that section. The trial court found this argument contradicted by the allegations made in the petition. Here, too, the court was correct.

Third, Lu challenged the sufficiency of the allegations to Royals's petition to support a claim for statutory penalties under Probate Code section 859, or under Civil Code section 3345.[15] We see no error here either.

_____

[15] We note there is split in the appellate precedent as to whether, in a financial elder abuse action, statutory penalties under Probate Code section 859 require a predicate showing of bad faith (*Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025, 1035–1036) or merely undue influence without any additional showing of heightened culpability (*Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1130). We have no occasion in resolving this appeal to

The allegations of Royals's petition sufficiently aver that Lu knowingly took advantage of Adams's declining cognitive and physical health in persuading him to take out a home equity loan on one property and sell another and transfer the proceeds to Lu. While Lu contests these allegations, she does not explain how, assuming they are true, they fail to make out a claim for financial elder abuse or statutory penalties under Probate Code section 859 or Civil Code section 3345.

### 5. Lu's Claims of Judicial Bias Are Meritless

Lu has made multiple, unsuccessful claims of judicial bias, via writ petition and in the interpleader appeal. (*Royals v. Lu*, *supra*, A160265 [2021 WL 5998551, p. *6]; *Lu v. Superior Court* (July 10, 2020, A160425), petn. den.; *Lu v. Superior Court* (Aug. 4, 2020, A160605), petn. den., review den. Aug. 26, 2020, S263915; *Lu v. Superior Court* (Feb. 28, 2022, A164611), petn. den.) Lu's briefing on this point presents many of the same arguments we have already rejected. We will not reconsider them here.

Lu also raises complaints of judicial bias regarding orders that postdate the filing of this appeal and that are currently under review, but those orders are not properly before us. The one complaint that appears to be properly before us is alleged bias in connection with an order granting Royals's ex parte application to appoint a discovery referee. We conclude here, as we did in resolving Lu's prior complaints of judicial bias, that her claims have no merit.

## III. DISPOSITION

We reverse the trial court's order of September 4, 2020, issuing a writ of attachment and right to attach order. We reverse the order of August 11,

---

pass upon that issue. We assume without deciding that a showing of bad faith is required.

2020, to the extent it sustains Royals's demurrer to the sixth count of Lu's cross-petition alleging financial elder abuse.  We otherwise affirm all orders from which this appeal is taken.  The parties shall bear their own costs on appeal.

STREETER, Acting P. J.

WE CONCUR:

BROWN, J.
NADLER, J.*

---

\* Judge of the Superior Court of California, County of Sonoma, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:  Superior Court of California, County of Contra Costa

Trial Judge:  Hon. Virginia M. George

Counsel:      Law Offices of X. Young Lai and X. Young Lai,
                 for Defendant and Appellant.

              Hartog, Baer & Hand, Andrew R. Verriere and
                 Amanda E. Sherwood, for Plaintiff and Respondent.